MELVIN JOSEPH GEARY, APPELLANT, *v.* THE STATE OF NEVADA, RESPONDENT.

No. 24277

March 30, 1994                    871 P.2d 927

[Rehearing granted September 29, 1994]

*Michael R. Specchio,* Public Defender, *Jane McKenna,* Chief Appellate Deputy Public Defender, *Janet Cobb Schmuck,* Deputy Public Defender, Washoe County, for Appellant.

*Frankie Sue Del Papa,* Attorney General, Carson City; *Dorothy Nash Holmes,* District Attorney, *David Wayment,* Deputy District Attorney, Washoe County, for Respondent.

## OPINION

*Per Curiam:*

On July 21, 1992, appellant, Melvin Joseph Geary ("Geary") came to the house of his former girlfriend, Pam Johnson ("Ms.

Johnson''), with blood on his pants. Geary appeared intoxicated and stated that he had been in a fight. Geary returned to Ms. Johnson's house on July 23, 1992, and told her that he had killed Edward Theodore Colvin (''Colvin''), the man with whom he was living. Ms. Johnson testified that Geary drank whiskey and talked with her until she called the police around midnight. Officer Larry Johnson (''Officer Johnson'') responded to the call and testified that he advised Geary of his *Miranda* rights and that Geary then confessed to killing Colvin. After hearing from two fellow officers, who were investigating Colvin's apartment and had discovered Colvin's body, Officer Johnson arrested Geary.

Upon Geary's arrival at the Sparks Police Department, Detective Gary Potter again read Geary his *Miranda* rights and then questioned Geary. Detective Potter testified that Geary appeared to be heavily intoxicated, but that he was able to respond to questions in a coherent manner and was in control of his faculties. Geary's subsequent confession was audiotaped and then played to the jury during trial. The following day Geary was again given his *Miranda* warnings and interviewed again on videotape by Detective Torres. A boning knife with Geary's initials on it was found at Colvin's home; tests revealed that there was human blood on the knife.

On March 26, 1993, following a jury trial, Geary was convicted of the murder of Colvin and sentenced to death. A jury found Geary to be eligible for the death penalty because he had committed a prior murder in 1974, because he was on parole at the time he murdered Colvin, and because he murdered Colvin at random and without apparent motive. The jury further found that mitigating circumstances did not outweigh aggravating circumstances and ultimately exercised its discretion and imposed the death penalty.

On appeal, Geary raises four assignments of error: (1) the district court improperly allowed the jury to hear involuntary statements by Geary; (2) the district court improperly instructed the jury on the state of mind necessary for first-degree murder; (3) the verdict at the penalty phase was impermissibly tainted by juror misconduct; and (4) the district court allowed the jury to consider duplicative aggravators at the penalty phase.

## GUILT PHASE ISSUES

Geary asserts that his confession to Ms. Johnson was involuntary because he was intoxicated, that his confession to Detective Potter was involuntary because he (Geary) was intoxicated and was deprived of food and sleep and because he was never told that he could contact friends or family. Finally, Geary argues that his confession to Detective Torres was involuntary because Geary

was confused and could not remember details. Geary argues that the district court should have excluded his confessions under Passama v. State, 103 Nev. 212, 214, 735 P.2d 321, 323 (1987), and that, therefore, his conviction must be overturned.

In response, the State contends that Detective Potter only questioned Geary for two hours, that Geary never requested food, only coffee and cigarettes, which he was given, and that when Geary asked to sleep, he was allowed to do so. The State also asserts that Geary never asked to speak to family or friends.

*Passama* lists several factors which are relevant in determining whether a defendant's statement was voluntary:

> [t]he youth of the accused; his lack of education or his low intelligence; the lack of any advice of constitutional rights; the length of detention; the repeated and prolonged nature of questioning; and the use of physical punishment such as the deprivation of food or sleep.

103 Nev. at 214, 735 P.2d at 323. None of these factors are present here. Geary's allegations of error center around his interrogation by Detective Potter. Detective Potter testified that Geary recognized other people at the police department and spoke cordially with them; he also testified that when Geary asked to sleep, he was allowed to do so, and that Geary's requests for coffee and cigarettes were granted. Moreover, even if Geary's first three confessions were tainted by his intoxication, Geary was certainly sober during his fourth confession to Detective Torres the following day. We conclude that the district court did not err in allowing the jury to consider Geary's statements.[1]

Next Geary argues that the jury was given an improper state-of-mind instruction. The district court gave the following instruction on state of mind:

> Evidence which tends to prove that the Defendant did not, in fact, entertain the specific intent or state of mind at the time of the act, which is by definition a requisite element of the crime charged, should be considered for the purpose of determining whether the crime charged was, in fact, committed.

Geary contends that the instruction should have begun as follows: "Evidence *of an abnormal mental condition, not amounting to insanity,* which tends to prove . . . ." (Emphasis added.) Geary properly points out that "[a] defendant in a criminal case is entitled, upon request, to a jury instruction on his theory of the

---

[1]We do not consider Geary's argument as to whether the admission of an involuntary confession is subject to harmless error analysis because it is so clear that none of Geary's statements were involuntary.

case so long as there is some evidence, no matter how weak or incredible, to support it." Harris v. State, 106 Nev. 667, 670, 799 P.2d 1104, 1105-06 (1990). However, a criminal defendant is not entitled to an instruction which incorrectly states the law. In the instant case, the proposed defense instruction is an incorrect statement of law because it refers to diminished capacity rather than state of mind. The "abnormal mental condition" language proffered by Geary invites the jury to confuse capacity with state of mind. As this court stated in Geary v. State, 91 Nev. 784, 544 P.2d 417 (1975), the relevant question to be posed in a state-of-mind instruction is *"[a]ssuming that the defendant was capable of premeditating,* did he in fact premeditate?" *Id.* at 792, 544 P.2d at 423 (emphasis added). Geary's proposed instruction invites the jury to confuse Geary's capacity to premeditate with the question of whether he did, in fact, premeditate. Accordingly, we conclude that the district court did not err in refusing to give Geary's proposed instruction to the jury. The murder conviction is affirmed.

## PENALTY PHASE ISSUES

Geary contends that the jury's penalty phase verdict is tainted because one of the jurors wrote a short note to her daughter during the penalty phase. Geary cites Rowbottom v. State, 105 Nev. 472, 474-75, 779 P.2d 934, 942-43 (1989), for the proposition that *any* juror misconduct requires reversal. This misstates *Rowbottom;* in *Rowbottom* this court reversed a conviction because one of the jurors read newspaper accounts of the trial and communicated those accounts to other members of the jury. *Id.* at 486, 779 P.2d at 943. *Rowbottom* set forth the factors to be considered in determining whether juror misconduct constitutes harmless error or prejudicial error: "whether the issue of innocence or guilt is close, the quantity and character of the error, and the gravity of the crime charged." *Id.* at 486, 779 P.2d at 943 (citation omitted). This court further held that the question was one of fact to be determined by the trial court, "and its determination will not be disturbed on appeal in the absence of a showing of an abuse of discretion." *Id.,* 779 P.2d at 943 (citation omitted).

Applying *Rowbottom* to the case at bar, we conclude that the issue of guilt or innocence in this case is not close. Geary has confessed to the murder several times, and the murder weapon found at the victim's home had Geary's initials on it and bore traces of human blood. We also conclude that the juror misconduct in this case was not egregious. Geary, however, compares it to Paine v. State, 107 Nev. 998, 823 P.2d 281 (1991), where this court reversed a death penalty judgment because of allegations that one member of the three-judge panel slept during the penalty

phase hearing. *Id.* at 1001, 823 P.2d at 283. In *Paine,* however, this court relied on the Code of Judicial Conduct and expressly held that "our holding today will not be expanded beyond these extraordinary circumstances. Had an evidentiary hearing been held immediately after the penalty hearing, we may have arrived at a different result." *Id.,* 823 P.2d at 283. Here, the district court did hold an evidentiary hearing. The juror testified that the note was written to her daughter and was very brief and that she did not miss a word that was said during the hearing. Furthermore, the foreperson of the jury also testified that the juror participated constructively in deliberations. Finally, although the gravity of the crime charged here certainly weighs in Geary's favor on this issue, we conclude that, on balance, the district court did not abuse its discretion in refusing to grant Geary's motion for mistrial based on juror misconduct.

Geary also claims that the trial court erred in the penalty hearing by allowing the jury to consider two duplicative aggravating circumstance instructions. Accordingly to Geary these duplicative instructions violated his right to be free of double jeopardy. The State responds that these aggravators are not duplicative, and that even if they are, this court should reweigh the mitigating and aggravating circumstances and impose the death penalty. The instruction at issue put the following aggravators before the jury:

> 1.   The murder of EDWARD COLVIN was committed by defendant MELVIN JOSEPH GEARY while he was under sentence of imprisonment in that defendant MELVIN JOSEPH GEARY was on parole from the Nevada State Prison.
> 2.   The murder of EDWARD COLVIN was committed by defendant MELVIN JOSEPH GEARY who was previously convicted of another murder in 1974 in the State of Nevada.

Geary contends that both aggravators "deal with Mr. Geary's prior conviction for murder." While this is true, that fact alone does not make the aggravators duplicative; the first aggravator allows the jury to find Geary death-eligible if they find that he was on parole from a Nevada prison when he killed Colvin. The second aggravator allows the jury to find Geary death-eligible if they find that he committed a previous murder in Nevada. One can conjure up numerous hypotheticals to illustrate the differences between these two aggravators. For example, Geary could have been on parole for another felony such as burglary. Or Geary might have been fully pardoned for the murder and,

therefore, not on parole.[2] In addition, the jury also found another aggravator to be present: "The murder was committed upon one or more persons at random and without apparent motive." Geary has not challenged this particular aggravator on appeal.

We conclude that the district court did not give the jury duplicative aggravators to consider. Geary does not deny that he was on parole at the time of the murder or that he had been previously convicted of another murder. Nor does he complain that any other error was made in instructing the jury at the penalty phase. Given the inherent gravity of death penalty appeals, however, we will proceed to consider whether the jury instructions at the penalty phase were otherwise proper.

### PROPRIETY OF PENALTY INSTRUCTIONS

From a reading of the penalty instructions it appears that the jury was first properly instructed that it "*may* impose a sentence of death *only* if it finds beyond a reasonable doubt that there is at least one aggravating circumstance and further finds that there are no mitigating circumstances which outweigh aggravating circumstance(s)." (Instruction No. 12; emphasis added.) After instructing the jury that it had the power to "impose the sentence of death" *only* after it made the two stated findings, the trial court correctly instructed the jury that if it found that "the aggravating circumstances are outweighed by the mitigating circumstances, then you do not need the death verdict form.[3] The jury was, accordingly, properly instructed that it may impose the death penalty only if the two conditions for death-eligibility were found beyond a reasonable doubt and that if these conditions were not met, it could no longer consider the death penalty as an option.

Because the second death-eligibility requirement, that "there

---

[2]The State also points out that "[t]hese [t]wo aggravating circumstances address different state interests. The first state interest is in punishing more harshly defendants who have committed another murder, and the second state interest is in punishing more harshly defendants who have received the gift of parole." We agree.

[3]The trial court should have, of course, to be consistent, further instructed the jury that if it did not find "at least one aggravating circumstance," the jury would likewise not be in "need [of] the death verdict form." Defense counsel apparently did not notice this failure and did not object to it. Because, as said, the trial court did instruct the jury, in the first part of Instruction No. 12, that it could impose death "only" if it found at least one aggravating circumstance, we find no prejudicial error in the trial court's referring only to the second death-eligibility factor (mitigating not outweighing aggravating circumstances) and neglecting to include, in Instruction No. 12, the death-eligibility requirement of at least one aggravating circumstance.

are no mitigating circumstances which outweigh the aggravating circumstance(s)," is not challenged or argued by Geary's defense lawyers, we do not have to consider this point. We are prompted to say, however, that in this case it would be asking a lot of an appellate court to ask that we declare, as a matter of law, that mitigating circumstances in this case[4] outweigh aggravating circumstances, when the aggravating circumstances are comprised of a two-time murderer having committed a random and motiveless murder while he was on parole.

It is important to recognize that in the overall scheme of the penalty instructions given by the court, the jury was properly advised that once it found death-eligibility, by finding "at least one aggravating circumstance and further find[ing] that there are no mitigating circumstances which outweigh the aggravating circumstance(s)," then "[u]ltimately the discretion of whether to impose the death penalty belongs to the jury."

A remaining question, and, again, a question that was not raised by Geary himself, is whether the jury went beyond the bounds of its "discretion" in imposing the death penalty in this case, that is to say, whether the death penalty in this case is, as a matter of law, *excessive*. We are required in all cases to review carefully the imposition of death, even where applicable points on appeal are not raised by defense counsel. NRS 177.055 (supreme court must consider, *inter alia*, "[w]hether the sentence

---

[4]The jury was instructed on the following mitigating circumstances:

NRS 200.035 provides that murder of the first degree may be mitigated by any of the following circumstances:

1.   The defendant has no significant history of prior criminal activity.

2.   The murder was committed while the defendant was under the influence of extreme mental or emotional disturbance.

3.   The victim was a participant in the defendant's criminal conduct or consented to the act.

4.   The defendant was an accomplice in a murder committed by another person and his participation in the murder was relatively minor.

5.   The defendant acted under duress or under the domination of another person.

6.   The youth of the defendant at the time of the crime.

7.   Any other mitigating circumstance.

(*Instruction No. 9.*) The record does not disclose that any of the explicit mitigating circumstances were present in this case. Certainly the jury did not so find. Various persons did testify favorably for Geary at the penalty hearing. The jury heard testimony that Geary was a model prisoner and helped with younger offenders, that he was an excellent employee who had considerable responsibilities, and that he was honest and hardworking. The jury expressly found that these mitigating circumstances did not overcome the three aggravating circumstances.

of death is excessive, considering both the crime and the defendant"); *see e.g.*, DePasquale v. State, 106 Nev. 843, 803 P.2d 218 (1990). We do so now.

Although this is the second time that Geary has engaged in a homicidal rampage, it is at least arguable that because Geary has a severe problem with alcohol and claims to have had no recollection of the murder, that he is not *deserving* of the death penalty. Even the prosecutor conceded that "apparently [Geary] is a really nice guy when he's sober" and that this would not be a death penalty case "on a first offense;" however, it is impossible to ignore Geary's prior history with alcohol, murder, and the criminal justice system. In 1974 Geary was convicted of the first-degree murder of Annette Morris, a stranger whom Geary took home and stabbed to death with a boning knife while he was grossly intoxicated. He was sentenced to life without the possibility of parole. Because of Geary's admirable conduct in prison, and because he had ceased to consume alcohol, the Pardons Board commuted Geary's sentence to life with the possibility of parole. Geary was then released on parole by the Parole Board in 1986, subject to the condition that he not consume any alcohol. In 1990 Geary violated his parole by consuming alcohol and was put back in jail. After four months, he was again released by the Parole Board. In 1991 he started drinking again, but completed an alcohol treatment program and was not reincarcerated. He began drinking again in 1992, and was again arrested and again paroled in June 1992. On July 24, 1992 he was arrested for the murder of Colvin.

In considering the question of excessiveness of the death penalty under the circumstances of this case, it appears that a jury was justified in concluding that clemency was not in order in this case. The jury certainly could have considered in mitigation Geary's impaired mental state and his addiction to alcohol as mitigating circumstances which might have led the jury to be more lenient in its disposition. The jury declined, however, to do so; and we are reluctant to "second guess" a jury under these circumstances. Furthermore, it does not appear that the jury's decision "was imposed under the influence of passion, prejudice or any arbitrary factor." NRS 177.055. As a consequence, we will not interdict the jury verdict in this case. The judgment of conviction and sentence of death are affirmed.